UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
UNITED STATES OF AMERICA,

     -against-                       S3 98 CR. 737 (KMW)
                                              ORDER

SAMVEL BOZAUNTS,
     a/k/a "Sam Bozaunts,"
IGOR YUKHA,
     a/k/a "Bolshoi,"
     a/k/a "Gary,"
GEORGIY Gleyzer,
     a/k/a "Gosha,"
     a/k/a "Andre the Tsircul,"
GARIAT IOUSOUPBEKOV
     a/k/a "Gagee,"
ILYA SKVIRSKIY
     a/k/a "Dlinni"
SEMION RAICHEL
     a/k/a "Psycho,"
     a/k/a "Senya,"
VITAUTUS KILTINIVICHOUS
     a/k/a "Big Vitas,"
LAMONT McLAURIN,
YURI MITZHIRITSKY, and
DENNIS TESHABAYEV,
                    Defendants.
-------------------------------X
WOOD, U.S.D.J.:

       Defendants have filed pre-trial motions with the Court
requesting (1) suppression of the fruits of various Government
wiretaps, (2) suppression of post-arrest statements pursuant to the
Vienna Convention, (3) suppression of evidence recovered from an
apartment located at 25 Broad Street, (4) suppression of
identification testimony, (5) an Order directing that there be no

-1-

in-court identification by two Government witnesses, (6) severance of the trials of various defendants, (7) dismissal of certain counts of the Indictment, (8) certain additional discovery, (9) suppression of evidence recovered during certain searches, and (10) suppression of certain post-arrest statements.    For the reasons stated below, these motions are denied.

## I.    DISCUSSION

## 1.    Suppression of the Fruits of Government Wiretaps Is Not Warranted

Five defendants move this Court to suppress evidence gained from court-authorized Title III interceptions on the grounds that the Government failed to (i) demonstrate the inadequacy of alternative investigative techniques before employing electronic surveillance, and (ii) conduct proper minimization of intercepted conversations.    Defendants also move to compel the Government to disclose materials related to an electronic surveillance that took place in 1997 in which three of the defendants - Bozaunts, Yukha, and Skvirskiy - were intercepted.    The Court denies these motions.

### A.    The Government Met Its Burden of Demonstrating the Inadequacy of Alternative Investigative Means

18 U.S.C. § 2518(1)(c) provides that an application for the interception of electronic communications must include "a full

-2-

and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." As the Second Circuit has stated, this "alternative investigative techniques" provision does not establish any "requirement 'that any particular investigative procedure be exhausted before a wiretap is authorized.'" United States v. Young, 822 F.2d 1234,1237 (2d Cir. 1987) (citing United States v. Lilla, 699 F.2d 99, 104 (2d Cir. 1983)). Instead, the wiretap application need only "provide some basis for concluding that less intrusive investigative procedures are not feasible." Lilla at 103. "The Government must demonstrate only that normal investigative techniques would prove difficult. It need not show that any other option would be doomed to failure." United States v. Bellomo, 954 F.Supp. 630, 638-9 (S.D.N.Y. 1997).

Defendants assert that the Government could have better employed (1) the assistance of cooperating witnesses, (2) physical surveillance techniques, (3) additional consensual recordings, and (4) undercover agents to infiltrate defendants' alleged organization (the "Brigade") before resorting to electronic surveillance, and that the Government's failure to do so merits the suppression of wiretap evidence. (See Memorandum of Law In Support of Defendant Georgiy Gleyzer's Pre-Trial Motions ["Gleyzer Mem."], dated April 17, 2000, 10-13.) The Court finds, however, that the

-3-

Government provided Judges Cederbaum, Chin, and Cote -- the judges who reviewed the wiretap applications -- more than adequate information in its applications to conclude that these less intrusive investigative techniques would be ineffective, and therefore the Court declines to suppress the wiretap evidence on this basis. First, the Court notes that the Government's cooperating witnesses are victims -- rather than members, accomplices, associates, or co-conspirators -- of the Brigade; as a consequence, the information to which these witnesses would have had access with regard to the Brigade's activities was inherently limited. (See Affidavit of Special Agent Vadim Thomas in Support of an Application for an Order Authorizing the Interception of Wire Communications ["Thomas Aff."], dated January 29, 1998, ¶ 45(1).) Second, defendants' various alleged efforts to avoid physical surveillance -- which included driving at high speeds, darting between lanes, changing directions suddenly on roads, using multiple vehicles to "cut off" other cars, and engaging in "walk and talks" when discussing the Brigade's plans -- greatly limited the utility of such surveillance. (See Thomas Aff. ¶ 45(4).) Third, two of the Government's three cooperating witnesses allegedly refused to wear recording devices out of fear for their own safety, and one cooperating witness reported being "patted down" by a Brigade member to determine if he was wearing a

-4-

recording device.    These allegations suffice to establish the
unlikelihood that the Government would have succeeded in obtaining
consensual recordings and the fact that attempting to obtain such
recordings posed a great danger to the safety of the Government's
cooperators.    (See Thomas Aff. ¶ 45(2).)    Finally, given the
apparently close-knit nature of the Brigade and the trust the
members placed in each other, the Court credits the Government's
assertion that successful infiltration by a Government agent was
highly unlikely.    (See Thomas Aff. ¶ 45(9).) Thus, taking into
account these circumstances and the substantial deference due the
decisions of Judges Cote, Chin, and Cederbaum, the Court denies
defendants' motion to suppress wiretap evidence on the ground that
the Government failed to demonstrate the inadequacy of alternative
investigative methods.

B.    The Government Did Not Fail to Properly Minimize
      Intercepted Calls

18 U.S.C. § 2518(5) provides, in pertinent part, that
every wiretap "shall be conducted in such a way as to minimize the
interception     of     communications     not     otherwise     subject     to
interception under this chapter . . . ."  In reviewing Government
agents' efforts at minimization, Courts must be mindful that "the
standard . . . is that agents observe reasonable safeguards against

-5-

excessive intrusion." United States v. Terry, 702 F.2d 299, 312 (2d Cir. 1983). This reasonableness test requires a case-by-case analysis of the particular facts surrounding the interception, Scott v. United States, 436 U.S. 128, 140 (1978), with courts focusing on the purpose of the wiretap and the "totality of the circumstances" of each case. United States v. Napolitano, 552 F.Supp. 465, 476 (S.D.N.Y. 1982). In conducting this reasonableness inquiry, courts analyze such factors as (1) the scope of the conspiracy, (2) the duration and nature of conversations, (3) the pattern of calls, (4) the stage of surveillance, (5) the percentage of non-pertinent calls, and (6) any use by defendants of coded language. Courts have found that it is not unreasonable for monitoring agents to intercept large numbers of non-pertinent calls when the conversations are short, occur only once, or are ambiguous in nature. Scott at 140. Further, during initial periods of interceptions -- when monitoring agents are unfamiliar with the pattern of telephone calls -- more non-pertinent conversations also may be intercepted. Id. at 141. The existence of a widespread conspiracy whose scope is unclear to monitoring agents also can justify more extensive interception than would otherwise be appropriate. Id. at 140; see also United States v. Hoffman, 832 F.2d 1299, 1308 (2d Cir. 1987) ("where, as here, an investigation is focused largely on blueprinting the shape of the

-6-

conspiratorial wheel and identifying the spokes radiating from its hub, the need to allow latitude to eavesdroppers is close to its zenith"). Finally, "minimization may be more difficult and more extensive surveillance may therefore be permitted" where "the targets use jargon or code words or speak in a foreign language." United States v. Santoro, 647 F.Supp. 153, 160 (E.D.N.Y. 1986).

In analyzing the Government's efforts at minimization in this case, the Court notes that calls two minutes and under need not be minimized, United States v. Capra, 501 F.2d 267, 276 (2d Cir. 1974); United States v. Armocida, 515 F.2d 29, 45 (3d Cir. 1975); consequently, the Court excludes any such calls from its analysis. Further, courts have identified several measures that Government agents may take to increase the likelihood of compliance with § 2518(5). These include (1) maintenance of monitoring logs, United States v. Hinton, 543 F.2d 1002 (2d Cir. 1976); United States v. Rizzo, 491 F.2d 215, 217 (2d Cir. 1974), (2) judicial supervision of the progress of the surveillance, Santoro at 153, (3) provision of written and oral instructions to monitoring personnel regarding the legal requirements for minimization, Santoro at 161, (4) requiring all monitoring personnel to read the court orders and applications, and posting of the minimization instructions, court orders, and applications at the monitoring site, Id., and (5) supervision by the prosecutor. Rizzo at 217.

-7-

See generally United States v. Prada, 1991 WL 161323 at *6
(S.D.N.Y. 1991, Wood, J.).

Seventy-nine percent (79%) of the calls received on the
Bozaunts telephone and sixty-four percent (64%) of the calls
received on the Yukha cellphone were under two minutes, and must be
excluded from the minimization analysis.[1]   Of the remaining
telephone calls, it appears that the Government minimized forty-two
percent (42%) of the calls completed using these telephones. Given
(1) the widespread nature of the Brigade's alleged activities, (2)
the Government's use of the wiretap to "blueprint" the Brigade and
its alleged activities, (3) Brigade members' use of jargon, code
words, and the Russian language in their conversations, and (4) the
Government's compliance with the measures courts have identified as
increasing the likelihood of compliance with § 2518(5), the Court
finds that the Government made reasonable efforts to avoid
excessive intrusion in the affairs of Brigade members. Therefore,
the Court denies defendants' motion to suppress wiretap evidence

---

[1]     The Court notes that its minimization inquiry is limited
to calls completed using either the Bozaunts telephone or the Yukha
cellphone, because no defendant has standing to challenge
minimization of the calls completed using the Spitchenko telephone
or the Spitchenko cellphone.  The Second Circuit has concluded that
only individuals with a possessory or proprietary interest in the
premises on which the subject phone is located have standing to
contest minimization, see United States v. Ruggiero, 928 F.2d 1289,
1303 (2d Cir. 1991); Prada at *3, and no defendant possesses the
requisite interest to challenge these calls.

-8-

for allegedly insufficient minimization.

### C.   Disclosure of Materials Related to the 1997 Surveillance is Unwarranted

In August, 1997, the Government sought and obtained authorizations from Judge John Koeltl to intercept wire and oral communications made by Rita Kuparadze on her office telephone and within her offices. These interceptions were conducted during an investigation of wire and visa fraud involving Kuparadze and others; the interceptions terminated in November, 1997. During the three month interception period, three of the defendants in this case -- Skvirskiy, Bozaunts, and Yukha -- were intercepted. Based on that fact, defendants now assert that "the Thomas Affidavit relies on the 1997 Koeltl Orders or, at a minimum . . . the prior communications intercepted were intimately involved with the investigation leading to the instant indictment." (See Affirmation of Francisco C. Celedonio ["Celedonio Aff."], dated April 17, 2000, ¶ 12.) Defendants move for production of the applications underlying the 1997 Koeltl Orders, arguing that "if the applications in support of the 1997 Koeltl Orders were deficient, much of the subsequent investigation could be the fruit of the poisonous tree and subject to suppression." (Celedonio Aff. ¶ 13.)

The Court finds that production of materials related to

-9-

the 1997 surveillance is unwarranted.  The Thomas Affidavit cites

only three of the calls intercepted pursuant to Judge Koeltl's 1997

Orders.   (See Thomas Aff. ¶¶ 34-36.)  These three calls merely

corroborate  two  of  the  Government's  cooperating  witnesses'

statements  concerning  Yukha  and  Bozaunts;  they  provide  no

additional evidence to support the authorizations for the wiretaps

in this case.   Consequently, the wiretap evidence in this case

could not be considered to be the "fruit" of the 1997 wiretaps, and

production of the materials supporting the authorization for these

wiretaps is not required.

### 2.   Suppression of Post-Arrest Statements Pursuant to Article 36 of the Vienna Convention Is Not Warranted

Defendants Iousoupbekov and Bozaunts move to suppress

post-arrest statements on the ground that the Government violated

Article 36 of the Vienna Convention on Consular Relations ("Vienna

Convention") by failing to advise them after arrest of their right

to consult with their consulate.   Vienna Convention on Consular

Relations,  April 24, 1963, 21 U.S.T. 77.    The Court denies

defendants' motion because suppression of post-arrest statements is

not an appropriate remedy for violations of this treaty.

Defendants cite no authority supporting suppression as a

remedy  for  violations  of  the  Vienna  Convention;  substantial

authority exists, however, to support the position that suppression
is not appropriate in such circumstances.  More specifically, in
en banc decisions rendered less than three months ago, both the
First and Ninth Circuits ruled that suppression of post-arrest
statements is not warranted for violations of the Vienna
Convention.  In United States v. Lombera-Camorlinga, 206 F.3d 882
(9th Cir. 2000), the Ninth Circuit ruled that the suppression of
evidence is not an appropriate remedy for a violation of the Vienna
Convention, stating that "there is nothing in the language or
operation of the treaty provision to suggest that Article 36 was
intended to create an exclusionary rule with protections similar to
those announced  . . . in Miranda v. Arizona."  Id. at 883-4.  In
so finding, the Circuit noted that (1) "this and other circuits
have held in recent years that an exclusionary rule is typically
available only for constitutional violations, not for statutory or
treaty violations," id. at 886, and (2) the State Department "has
expressed its opinion that suppression is an inappropriate remedy"
for violations of the Convention.  Id. at 887.  The First Circuit
took the same position in United States v. Li, 206 F.3d 56, 60 (1st
Cir. 2000) ("the appropriate remedies [for a violation of the
Vienna Convention] do not include suppression of evidence or
dismissal of the Indictment").  Courts in this Circuit have

-11-

followed this path as well.   See United States v. Rodriques, 68 F.Supp.2d 178, 184-185 (E.D.N.Y. 1999) ("Consular notification is not a fundamental right derived from the Constitution . . . [and] the principal justification for excluding relevant evidence -- to reduce governmental infringement on fundamental Constitutional rights -- is not implicated when Article 36 of the Convention is violated"); United States v. Salameh, 54 F.Supp.2d 236, 279 (S.D.N.Y. 1999) ("suppression of [defendant's] post-arrest statements would certainly not be a proper remedy" for a violation of the Vienna Convention).   Therefore, the Court denies defendants' motion to suppress their post-arrest statements on these grounds.

## 3.   Suppression of Evidence Recovered From Apartment TSO Is Not Warranted

Federal agents searched Bozaunts' apartment pursuant to a search warrant that authorized them to recover "documents, records, [and] facsimiles reflecting financial and credit information regarding individuals."   Bozaunts argues that the evidence obtained from this search must be suppressed, because the agents exceeded the scope of their warrant -- thereby converting the search into an unconstitutional "general" search -- and the items which were not covered by the warrant were not "in plain view."   The Court finds, however, that the agents were authorized

-12-

by the search warrant to seize the documents and microcassette
taken from Bozaunts' apartment, and that the other evidence was
properly seized under the "plain view exception" to the warrant
requirement.[2]   Therefore, the Court denies Bozaunts' motion.


   A.   The Seizure of Documents and The Microcassette Tape

        In reviewing the federal agents' seizure of documents and
an audiocassette from Apartment TSO, the Court is mindful that:

              "The law in this area is clear . . . officials
              executing a warrant have some discretion [] in
              interpreting the scope of the warrant.  Their
              interpretation of the scope of the warrant
              need not be hyper-technical, but rather should
              be commonsensical.  Moreover, it is generally
              left to the discretion of the executing
              officers to determine the details of how best
              to proceed with the performance of a search
              warrant – subject, of course, to the general
              Fourth   Amendment   protection   against
              unreasonable   searches   and   seizures.
              Governmental conduct throughout searches and
              seizures must meet a standard of objective
              reasonableness.  Salameh at 277.

        The  Government  agents'  seizure  of  documents  from

_____

        [2]    The Court denies this motion at this time, because the
Government has represented that it will not present the following
evidence seized from Bozaunts' apartment in its case-in-chief:
videotapes, photographs (with the exception of ten black and white
photographs seized from the top of Bozaunts' television), all but
one audiocassette tape, a map with pins, jewelry, a computer,
computer disks, two flyers, a cellular telephone, an answering
machine, and two receipts.  If the Government seeks to use any of
this evidence at trial, defense counsel may orally renew this
motion.

Apartment TSO satisfied this objective standard of reasonableness, because the documents seized from Apartment TSO are covered by the terms of the warrant.  Although the agents may have reviewed many documents that were unconnected with this case when seizing these documents in the apartment, such a review of "innocuous" documents is insufficient to convert the agents' search into an unconstitutional general search.  Indeed, the "argument that []  executing officers [go] beyond the scope of the warrant because they rummag[e] at will through papers is unpersuasive, since in any search for documents, innocuous records must be examined to determine whether they fall into the category of those papers covered by the search warrant."  United States v. Kufrovich, 997 F.Supp. 246 (D.Conn. 1997) .  Moreover, the documents seized were written almost entirely in Russian, making the agents' task even more difficult.

The Government's seizure of the microcassette tape was also authorized by the search warrant.  Courts have held that warrants that authorize the seizure of "records" extend to audiotapes.  See United States v. Peters, 92 F.3d 768, 770 (8th Cir. 1996); United States v. Gomez-Soto, 723 F.2d 649, 655 (9th Cir. 1983) ("a microcassette is by its very nature a device for recording information in general whether it be statistical

-14-

information, conversations, past events, or future plans, all of which come clearly within the specific authority of [a] warrant" which authorized seizure of "records," but did not specify cassette tapes); United States v. Lucas, 932 F.2d 1210, 1215-1216 (8th Cir. 1991).

### B.    The Seizure of Other Items

The Court denies the motion to suppress nine additional pieces of evidence seized during the Bozaunts apartment search: (1) "Bella Donna" business cards, (2) a switch-blade knife, (3) ten black and white photographs, (4) a black ski mask, (5) a roll of gray duct tape, (6) an empty box of "Clairol Frost & Tip" hair dye, (7) a handcuff key, (8) an owner's manual for a portable police scanner, and (9) a police "call book." (Government's Memorandum of Law in Opposition to Defendants' Pre-Trial Motions ["Government's Mem."], dated May 23, 2000, P. 80-81; Affidavit of Special Agent Mario Pisano ["Pisano Aff."], dated May 19, 2000, ¶¶ 4(a)-(g).) These items are not covered by the terms of the agents' search warrant, but the Court finds that they were properly seized under the "plain view" exception to the warrant requirement.

As recently stated by the Second Circuit, evidence may be seized without a warrant under the plain view exception only "if

-15-

police are lawfully in a position from which they can view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object." United States v. Kiyuyung, 171 F.3d 78, 83 (2d Cir. 1999). The Court relies upon the Pisano Affidavit, and finds that these objects were in plain view to the investigating agents during the course of their search for documents; the agents were lawfully in a position to see each object and to have access to it, and the objects, considered along with the agents' knowledge of the Brigade's activities, were "incriminating on their face."

## 4.   Suppression of Identification Testimony Is Not Warranted

Defendants Bozaunts, Yukha, Gleyzer, Kiltinivichous, and Iousoupbekov move for a hearing concerning the propriety of identifications made by certain government witnesses. Defendants Bozaunts, Yukha, Gleyzer, and Kiltinivichous were identified by means of a 30-photograph photo array created by the INS.[3]  In addition, defendants Bozaunts, Yukha, and Iousoupbekov were also

---

[3]    This array contained photographs of white men from the former Soviet Union.   The photos were obtained from INS applications filed by the men.   The photos were shown to interviewees at the end of interviews; the interviewees were simply asked if they recognized any of the men in the photos. None of the photographs was ever displayed individually; rather, each interviewee was shown the entire array (See Lieberman Affidavit ¶¶ 2, 5.)

-16-

identified by means of a six-photo array prepared by the FBI.[4]
Defendants Bozaunts and Kiltinivichous -- whose motions are joined
by defendants Iousoupbekov and Gleyzer -- request a hearing to
challenge their identifications because, they allege, the
Government witnesses who identified them were shown their photos
individually, rather than as part of the entire photo-array.  In
addition, defendant Yukha requests a hearing to examine the
propriety of his identification from the INS' 30-photo array,
because of his belief that his photo was labeled with the name
"Gary," while all other photos in the array were purportedly
unlabeled.  The Court finds that hearings are not warranted and
that these identifications may be employed at trial.

As Judge Nickerson observed in United States v. Volpe, "a
pretrial hearing on the suggestiveness of identification procedures
is favored, but not Constitutionally required."  42 F.Supp.2d 204,
223 (E.D.N.Y. 1999) (citing Watkins v. Sowders, 449 U.S. 341, 349
(1981)).  However, "whether to hold a hearing is within the
discretion of the district court," Id. (citing United States v.
Archibald, 734 F.2d 938 (2d Cir. 1984)), and "where a defendant's
motion is based entirely on speculation as to how the procedures

---

[4]     Any objections Yukha and Iousoupbekov may have to the
six-photo array are moot, because the government will not use their
photo-identifications at trial.

-17-

used in the identification might have been suggestive, and does not challenge the arrays themselves, a pre-trial hearing is not appropriate." Id. (citing United States v. Ruggiero, 824 F.Supp. 379, 396 (S.D.N.Y. 1993); see also United States v. Wei, 862 F.Supp. 1129, 1133 (S.D.N.Y. 1994) (court relying on Ruggiero to deny a pre-trial hearing). Bozaunts and Kiltinivichous' challenges to the photo arrays are entirely speculative; these defendants provide no grounds in their submissions to the Court -- beyond their asserted "belief" -- to support their claims that government witnesses were shown their pictures individually. In contrast, the Government has submitted sworn affidavits indicating that defendants' pictures were never shown apart from the INS or six-photo arrays. (See Affidavit of Special Agent Ira Lieberman ["Lieberman Aff."], dated October 31, 2000, ¶ 5); Affidavit of Special Agent Walter J. Stack ["Stack Aff."], dated October 31, 2000, ¶ 8). Thus, there is no basis for the Court to conclude that a hearing is necessary to investigate the procedure by which the arrays were employed.

        Yukha challenges the INS 30-photo array itself as being unduly suggestive; his claim is based on his assertion that his photo was labeled with the name "Gary" -- one of his aliases -- and that his photo was the only photo in the array labeled with a name.

As explained in the Lieberman Affidavit, however, the photo of Yukha actually shown to the Government's witnesses had the name Gary covered in white tape, as did two of the other photos used in the array, and therefore it did not stand out from the other photos on this basis.    (See Lieberman Aff. ¶¶ 6-8.)[5]    Moreover, the Court's review indicates that the array itself -- even with only three of the photographs bearing white tape -- was not unduly suggestive.    An array is not considered suggestive merely because a defendant's photograph bears a distinguishing feature. See United States v. Perry, 991 F.2d 304, 311 (6th Cir. 1993) (array not unduly suggestive where defendant's photograph the only one without height markings); Cikora v. Dugger, 840 F.2d 893, 896 (11th Cir. 1988) (six-photo array not unduly suggestive where only defendant's photo had height markings).    Indeed, "it is not required that all of the photographs in a photo array be uniform with respect to a given characteristic."    Jarrett v. Headley, 802 F.2d 34, 41 (2d Cir. 1986).    This is because "the Due Process Clause does not require law enforcement officers to scour about for a selection of photographs so similar in their subject matter and composition as to make subconscious influences on witnesses an objective

---

[5]       The Court notes that a photo of Yukha's father was also used in the array, and that that photo was actually labeled with the name "Yukha."

impossibility." <u>United States v. Bubar</u>, 567 F.2d 192, 199 (2d Cir. 1977). The fact that Yukha's photo was one of three bearing white tape is insufficient to trigger the conclusion that the array was unduly suggestive. Moreover, there is nothing about the photos constituting the array that could lead the Court to conclude that the array was "unduly suggestive" in any way. The pictures depict white males who appear to be from Central and Eastern Europe, are dressed in civilian clothes, and have a diverse range of hairstyles and facial hair. Thus, Yukha has "failed to make a threshold showing of suggestiveness, and therefore no pre-trial hearing, or more discovery regarding identification procedures, is required." <u>United States v. Torres</u>, 1995 WL 261531 at *4 (S.D.N.Y. 1995). In sum, due to the "absence of a sufficient pre-trial showing of impropriety, exploration of the circumstances surrounding the identification may properly be left to cross-examination at trial." <u>United States v. Padilla</u>, 1994 WL 681812 at *8 (S.D.N.Y. 1994).

5.   **There Is No Need for a Hearing to Address the Propriety of an In-Court Identification of Bozaunts By Two of The Government's Witnesses**

        Bozaunts seeks a hearing to challenge the propriety of any in-court identification to be made by two of the Government's witnesses.[6]   In Bozaunts' view, any such identification would be "in effect, the same that is condemned by courts in connection with 'show-ups,' except that it occurs during the trial, instead of before it." (Memorandum of Law In Support of Samvel Bozaunts' Pre-Trial Motions ["Bozaunts' Mem"], dated April 17, 2000, P. 21.) Bozaunts further asserts that, "because of its profound suggestiveness, a courtroom 'show-up' necessitates a [] hearing . . . for the court to determine whether there exists an independently reliable basis for the witness' identification." (Bozaunts Mem. P. 22.)

        The Court finds that it need not conduct such a hearing in this case.  As the Second Circuit has observed,

> "In evaluating whether an in-court identification is Constitutionally permissible, courts generally engage in a two-step inquiry.  First, the court determines whether the pre-trial identification procedures were impermissibly suggestive.  If they were, the court then determines whether the in-court identification was so tainted by

---

        [6]   These witnesses are referred to as "Victim A" and "Victim B" in the Indictment.

> the pre-trial procedures as to be unreliable
> under the totality of the circumstances. This
> distills to an inquiry into whether the in-
> court identification was independently
> reliable." United States v. Kwong, 69 F.3d
> 663, 666 (2d Cir. 1995).

The six-photo array identification procedures by which the
Government's two witnesses identified Bozaunts were not
impermissibly suggestive. Victim A and Victim B were interviewed
separately, asked to view the six-photo array as a whole (rather
than viewing any photo individually), and questioned as to whether
"they recognized any individuals," rather than whether they
recognized Bozaunts specifically. (Stack Aff. ¶ 8.) A review of
the six photos also indicates that Bozaunts' photo does not "stand
out" in any way from other photos in the array; the photos are all
of white males in their 20's and 30's, who appear to be from
Central and Eastern Europe, have close-cropped hair, have no facial
hair, wear civilian clothes, and have no identifying marks,
tattoos, or scars. (See Stack Aff. Exhibit B.) Because the pre-
trial procedures were not "impermissibly suggestive," the Court
need not engage in any further inquiry and concludes that in-court
identification of Bozaunts by Victims A and B is permissible.

## 6.   Severance of Trials Is Not Appropriate

Five defendants move for severance of their trials on various grounds. Mizhiritsky and McLaurin -- who are not named in the Indictment's RICO counts -- assert that they will suffer "spillover prejudice" if they are tried with the rest of the defendants, who are charged with RICO violations.[7] Kiltinivichous asserts that he will suffer spillover prejudice if he is tried with his fellow RICO defendants and could be prejudiced by the admission of co-defendant post-arrest statements in violation of Bruton v. United States, 391 U.S. 123 (1968). Iousoupbekov seeks severance due to his purported need for co-defendant testimony at trial and the potential spillover prejudice he may suffer from the Indictment's charge of conspiracy to distribute anabolic steroids. Finally, Yukha moves for severance on the basis of antagonistic defenses with his fellow defendants.

In reviewing these severance motions, the Court must be

_____

[7]      In his submissions to the Court, McLaurin also moves for severance on the ground that his retained counsel can represent him only in a shorter trial than the trial that he believes will take place if he is tried with his co-defendants; he argues that his inability to pay his retained counsel for a longer trial will deny him the opportunity to be represented by the counsel of his choice, thereby denying him his Sixth Amendment rights. At a hearing held on June 30, 2000, McLaurin's retained counsel was replaced -- with defendant's consent -- by another attorney who will represent him for the full length of the trial and who will be paid under the terms of the Criminal Justice Act. Consequently, the Court deems this motion to be moot.

-23-

mindful that "there is a preference in the federal system for joint

trials of defendants who are indicted together," because joint

trials "promote efficiency and 'serve the interests of justice by

avoiding the scandal and inequity of inconsistent verdicts.'"

Zafiro v. United States, 506 U.S. 534, 537 (1993) (quoting

Richardson v. Marsh, 481 U.S. 200, 209 (1987). Further,

> "a severance . . . should only be granted . .
> . if there is a serious risk that a joint
> trial would either compromise a specific trial
> right of one of the defendants, or prevent the
> jury from making a reliable judgment about
> guilt or innocence . . . a defendant seeking
> severance must show that the prejudice to him
> from  joinder  is  sufficiently  severe  to
> outweigh the judicial economy that would be
> realized by avoiding multiple, lengthy trials
> . . . [However,] Rule 14 does not require
> severance, even if prejudice is shown . . .
> [because] the rule  leaves the type of relief
> granted to the sound discretion of the trial
> court. United States v. Walker, 142 F.3d 103,
> 105 (2d Cir. 1998).

Given this strong presumption in favor of joint trials, "the

principles that guide the district court's consideration of a

motion for severance usually counsel denial." United States v.

Rosa, 11 F.3d 315, 341 (2d Cir. 1993). The Court applies these

standards to Defendants' severance motions below.

-24-

A.    McLaurin and Mizhiritsky

        McLaurin -- who is not charged with any RICO violations
-- asserts that he is charged in the Indictment with having been a
relatively minor actor, and seeks severance to avoid "spillover
prejudice" that might flow from a joint trial with the RICO-charged
defendants.   Mizhiritsky also asserts that he is a "peripheral
defendant" for whom severance is necessary to avoid spillover
prejudice. However, "it is well established that 'differing levels
of culpability and proof are inevitable in any multi-defendant
trial, and, standing alone, are insufficient grounds for separate
trials." United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir.
1988) (citing United States v. Carson, 702 F.2d 351, 366-7 (2d Cir.
1983).   Moreover, in reviewing a district court's denial of
severance, the Second Circuit has noted that "the fact that . . .
defendants [are] tried for a crime not committed by another
codefendant does not, without more, create the sort of miscarriage
of justice that would require a new trial." United States v.
Hernandez, 85 F.3d 1023, 1029 (2d Cir. 1996). McLaurin is charged
with participating in a hostage-taking and robbery with the RICO
defendants in May, 1998.  Proof of the charges against him will
require introduction of evidence pertaining to the actions of the
RICO-charged defendants, and therefore severance cf McLaurin's

trial would create a significant duplication of effort at multiple trials. Mizhiritsky is similarly charged with participating in the May, 1998, hostage-taking, and therefore severance would create a similar duplication of effort. McLaurin's and Mizhiritsky's assertions of possible spillover prejudice are insufficient to outweigh the presumption favoring joint trials, especially given the Court's ability to provide appropriate limiting instructions to the jury in a joint trial. See United States v. Cardascia, 951 F.2d 474, 483-4 (2d Cir. 1991) (trial judge's limiting instructions to jury "to avoid spillover prejudice specifically militated against any substantial prejudice occurring"). Consequently, the Court denies McLaurin's and Mizhiritsky's severance motions.

B.   Kiltinivichous

Kiltinivichous moves for severance based on spillover prejudice and possible violation of his Sixth Amendment Confrontation Clause rights. As described below, neither basis requires severance of Kiltinivichous' trial.

Kiltinivichous asserts that "a jury will be unable, because of the broad nature of the allegations of RICO and RICO conspiracy underlying the Indictment, to separate the few and narrowly circumscribed allegations against Mr. Kiltinivichous from

-26-

the allegations against his co-defendants." (Memorandum of Law in Support of Defendant Vitautus Kiltinivichous' Pre-Trial Motions ["Kiltinivichous Mem."], dated April 17, 2000, P. 8.) However, Kiltinivichous is charged with participating for more than a year in the Brigade's extortion scheme against the owners and employees of businesses that transported women from New York to New Jersey to act as dancers (Count I, Racketeering Act 6 and Counts 11-13). Despite defense counsel's characterization, the charges against Kiltinivichous therefore are not "few and narrowly circumscribed." Although Kiltinivichous is charged in fewer Counts than some other defendants, the minimal danger of spillover prejudice is insufficient to warrant severance under the Second Circuit standards outlined above. Consequently, severance is unwarranted on these grounds.

Kiltinivichous also moves for severance based on possible violation of his Confrontation Clause rights resulting from the introduction at trial of certain co-defendant post-arrest statements. As a general matter, post-arrest statements of co-defendants may be admitted at trial without violating a defendant's Sixth Amendment rights so long as the statements are redacted to eliminate any reference to the defendant. As the Second Circuit has stated, "this Court has held that 'a defendant's <u>Bruton</u> rights

-27-

are violated . . . only if the statement, standing alone, would clearly inculpate him without introduction of further independent evidence,'" and therefore "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a defendant's <u>Bruton</u> rights." <u>United States v. Tutino</u>, 883 F.2d 1125, 1135 (2d Cir. 1989) (<u>quoting</u> <u>United States v. Wilkinson</u>, 754 F.2d 1427, 1435 (2d Cir. 1985). The Government represents in its submissions to the Court that "any post-arrest statements which the Government intends to use at trial will be redacted to comply with <u>Bruton</u> and its progeny," and that "the redactions will be provided to defense counsel sufficiently in advance of trial to enable the Court to deal with any possible objections." (Government's Mem. P. 171.) Based on the Government's representation, the Court concludes that a joint trial will not threaten Kiltinivichous' Sixth Amendment rights and that severance therefore is not required.

C.    Iousoupbekov

Iousoupbekov moves for severance on two grounds.  First, he asserts that Bozaunts would be "willing to provide testimony in support of" his defense and that he "cannot receive a fair trial without [this] testimony."  Bozaunts is unwilling to waive his Fifth Amendment privilege in order to testify at a joint trial, however, and thus Iousoupbekov seeks severance to permit Bozaunts to testify at his severed trial.  Second, Iousoupbekov seeks to sever Count Sixteen of the Indictment -- which charges Bozaunts and Semion Raichel with conspiracy to distribute anabolic steroids -- so that Bozaunts may be tried on this charge at a separate trial.

The Court finds that severance is not warranted on either ground.  Bozaunts has submitted an affidavit to the Court in which he states only that "if Mr. Iousoupbekov were granted a later trial, I would be willing to testify on his behalf.  The testimony that I would give would support his defense that Mr. Iousoupbekov was not criminally responsible for crimes that he is charged with in the Indictment."  (Affidavit of Samvel Bozaunts ["Bozaunts' Aff."], dated April 15, 2000, ¶ 3.)  Bozaunts provides no further elaboration as to what his testimony might be, nor any reason to believe that his testimony would not be merely cumulative of other witness' testimony.  Such failure counsels against severance.

-29-

As the Second Circuit explained in United States v. Wilson, "in deciding whether to grant severance based on the defendant's need to call a co-defendant, a district court should consider '(1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the counter-arguments of judicial economy; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment." 11 F.3d 346, 354 (2d Cir. 1993). Iousoupbekov is charged in sixteen of the nineteen counts of the Indictment,[8] and severance therefore would require the Government to retry the vast majority of its case. Balancing the interests of judicial economy with Bozaunts' failure to provide more specific information regarding his testimony, the Court denies Iousoupbekov's motion to sever on these grounds. See United States v. Ford, 870 F.2d 729, 731-32 (D.C. Cir. 1989) (Court upholding denial of severance because of, inter alia, defendant's failure to elaborate on the substance of proffered co-defendant's testimony; defendant's "showing must be sufficiently definite in nature to allow the court reasonably to conclude that the testimony would in fact be 'substantially exculpatory'").

_____

[8]     Specifically, Iousoupbekov is charged in Counts 1-13 and 17-19.

-30-

Iousoupbekov's motion to sever Bozaunts' trial on Count Sixteen of the Indictment is also denied.   Iousoupbekov asserts that he would be "unfairly prejudiced by having the issue of drugs inserted in this trial," because "the issue of drugs [] has become [] emotionally charged [and] in a joint trial, the defendant will have to defend against the implication of knowing a 'drug dealer.'" (Memorandum of Law in Support of The Defendant's Motion for Suppression of Evidence, Severance as to Defendants, and Counts of the Indictment and Other Forms of Relief ["Iousoupbekov Mem."], dated April 17, 2000, P. 15.)   This argument is wholly without merit.   Iousoupbekov is charged with acts of kidnapping, hostage-taking, armed robbery, attempted robbery, arson, extortion, assault resulting in serious injury in aid of racketeering, and several counts of carrying and using a firearm during the commission of crimes of violence.   The danger of any prejudicial spillover from the "implication of knowing a drug dealer," when taken against the backdrop of these other charges, is minimal.

D.   Yukha

Count 10 and Racketeering Act 4 of Count 1 of the Indictment charge Yukha with conspiracy to extort property from Mizhiritsky.   On this basis, Yukha asserts that "a severance is

-31-

appropriate [] because of likely antagonistic defenses between Mr. Yukha and his co-defendant(s), specifically, co-defendant Mizhiritsky." (Memorandum of Law in Support of Defendant Igor Yukha's Pre-Trial Motions ["Yukha Mem."], dated April 17, 2000, P. 13.) The Court finds, however, that severance of Yukha's trial is not warranted.

The Second Circuit's standard for assessing the need for severance where it is claimed that there exist antagonistic defenses is both clear and stringent:

> "It is not the mere existence of antagonistic defenses that prompts a required severance. Instead, the defenses must conflict to the point of being so irreconcilable as to be mutually exclusive before we will find such prejudice as denies defendants a fair trial. Defenses are mutually exclusive or irreconcilable if, in order to accept the defenses of one defendant, the jury must of necessity convict a second defendant. The trial judge should order a trial severance when the jury, in order to believe the <u>core</u> of the testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant. Similarly, severance should be granted when antagonism at the <u>essence</u> of the defense prevails to such a degree -- even without being mutually exclusive -- that the jury unjustifiably infers that the conflict alone indicated that both defendants were guilty." <u>United States v. Cardascia</u>, 951 F.2d 474, 484 (2d Cir. 1991) (citations and internal quotations omitted; emphasis in original).

Yukha's failure to identify his and Mizhiritsky's purported "antagonistic defenses" makes it impossible for the Court to conclude that these defenses would be either "irreconcilable" or "mutually exclusive," as required by the Second Circuit's standard. As a consequence, the Court declines to sever Yukha's trial on these grounds.

**7.    Dismissal of Certain Counts of the Indictment is Inappropriate**

Defendants Yukha and Kiltinivichous have moved to dismiss certain counts of the Indictment.  Specifically, Yukha moves to dismiss Counts Six and Seven on the grounds that the Hostage Taking Act is both unconstitutional and improperly charged, and Counts Eight, Nine, Ten, Fourteen, and Fifteen because they do not adequately charge an effect on interstate commerce.  In addition, Kiltinivichous contends that Counts Five, Seven, Nine, Twelve, and Fifteen are multiplicitous and should be dismissed.  The Court addresses these arguments in order.

> A.    The Hostage Taking Act Is Both Constitutional and Properly Charged

Yukha contends that (1) the Hostage Taking Act, 18 U.S.C. § 1203, violates the Fifth Amendment's Due Process clause because "the Act criminalizes conduct undertaken by aliens which would not

-33-

violate the statute if undertaken by United States nationals,"
(Yukha Mem. P. 4), and (2) he cannot be charged with violation of
the Act because both he and the alleged victim ("Victim D") are
United States nationals.  On these grounds, Yukha moves to dismiss
counts based on the Act.

Both of Yukha's assertions are meritless, however, and
the Court therefore denies defendant's motion to dismiss Counts Six
and Seven.  The Second Circuit has explicitly rejected Yukha's Due
Process argument and ruled that the Hostage Taking Act is
Constitutional.  United States v. Lue, 134 F.3d 79, 85-87 (2d Cir.
1998) ("As long as the Hostage Taking Act is rationally related to
a legitimate government interest, it satisfies principles of equal
protection in this context . . . . In our view, the Act clears this
constitutional hurdle").  Further, Counts Six and Seven charge
defendants Bozaunts and Iousoupbekov -- who are nationals of
Uzbekistan -- in the hostage-taking, in addition to Yukha, ensuring
that the Act may properly be charged.  The Act provides, in
relevant part, that "it is not an offense [and thus the Act may not
be charged] . . . if the conduct required for the offense occurred
inside the United States, each alleged offender and each person
seized or detained are nationals of the United States, and each
alleged offender is found within the United States."  18 U.S.C. §

-34-

1203(b)(2) (emphasis added). However, "add one non-national to the mix . . .and the Act on its face applies." United States v. Lin, 101 F.3d 760, 765 (D.C. Cir. 1996). Because Bozaunts and Iousoupbekov are a part of the "mix" in these Counts, the Court denies Yukha's motion to dismiss.

## B.   The Hobbs Act Counts Adequately Charge an Effect on Commerce

Yukha next contends that "the Counts of the Indictment alleging violations of the Hobbs Act fail to establish even a minimal effect on interstate commerce and must be dismissed." (Yukha Mem. P. 7.) The Court finds, however, that the Indictment specifies an effect on interstate commerce sufficient to satisfy Second Circuit standards and therefore it declines to dismiss Counts Eight, Nine, Ten, Fourteen, and Fifteen.

In the context of reviewing a Hobbs Act case, the Second Circuit has stated that, although an indictment must "charge [] a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events," to satisfy these requirements the "indictment need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged

-35-

crime." <u>United States v. Alfonso</u>, 143 F.3d 772, 776 (2d Cir. 1998) (<u>quoting</u> <u>United States v. Stavroulakis</u>, 952 F.2d 686, 693 (2d Cir. 1992). In addition, the Court stated that it had "never held that an indictment alleging a violation of the Hobbs Act must specify the precise nature of the effect upon interstate commerce that the government intends to prove at trial, and we decline to do so now." <u>Id</u>. In this case, Counts Eight, Nine, Ten, Fourteen, and Fifteen track the language of 18 U.S.C. § 1951, and even make explicit reference to §§ 1951(b)(1)-(3) to define "robbery," "extortion," and "commerce." Further, these Counts provide both the month and year and the approximate location (<u>i.e.</u>, the Southern District of New York) of the alleged crimes. Consequently, the Indictment sufficiently charges Counts under the Hobbs Act, and the Court therefore denies Yukha's motion.

## C.   Counts Five, Seven, Nine, Twelve, and Fifteen Are Not Multiplicitous

Finally, Kiltinivichous asserts that "Counts Five, Seven, Nine, Twelve, and Fifteen are clearly multiplicitous and should be dismissed or consolidated with other counts of the Indictment." (Kiltinivichous Mem. P. 5.) Kiltinivichous further contends that "by the sheer number of repeated charges, the charging practice employed by the government in this case has crossed the line into

-36-

unfair and impermissible multiple charging of offenses for identical offense conduct." (Letter of Robert J. Krakow ["Krakow Letter"], dated June 6, 2000, P. 1.) Neither contention warrants dismissal of the five Counts cited, however.

Counts Five, Seven, Nine, Twelve, and Fifteen are substantive counts. Kiltinivichous asserts that these are "multiplicitous" of Counts Four, Six, Eight, Eleven, and Fourteen, which are conspiracy counts related to the substantive counts. The Supreme Court has confirmed that "a conspiracy to commit a crime is a separate offense from the crime itself," United States v. Felix, 503 U.S. 378, 391 (1992), and the Second Circuit has held that "conspiracy to commit a substantive offense and aiding and abetting the commission of the same offense constitute separate and distinct crimes and a defendant may be convicted of both." United States v. Tropiano, 418 F.2d 1069, 1083 (2d Cir. 1969). Thus, the five counts are not multiplicitous and do not subject defendants to "unfair and impermissible multiple charging of offenses."

## 8. Defendants' Additional Discovery Requests Are Denied

Various defendants have moved for (1) bills of particulars, (2) production of Brady material, (3) production of impeachment and "3500" material, (4) production of co-conspirator

-37-

statements, (5) production of prior "bad act" evidence, (6) production of witness lists, and (6) disclosure of the names of confidential informants. These motions are addressed below.

## A.    Bills of Particulars

Defendants Bozaunts, Yukha, and Iousoupbekov move for bills of particulars. The Court denies these motions. The choice of "whether to grant a bill of particulars rests within the sound discretion of the district court." United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990). The Second Circuit has instructed this Court that "the function of a bill of particulars is to provide defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at trial." Id. However, "a bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused," Id., and "generally, if the information sought by defendant is provided in the indictment or in some acceptable alternative form, no bill of particulars is required." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). The Court finds that the Indictment itself is pleaded with sufficient specificity that such a bill is not warranted. Further,

-38-

the Court finds that defendants have been provided abundant additional information related to the charges against them in the form of (1) the complaint, (2) materials relating to the court-authorized wiretaps, (3) draft transcripts of intercepted telephone calls and consensually-recorded conversations, (4) surveillance photographs and videotapes, and (5) documentary evidence seized from residence and vehicle searches.

### B.   Brady Material

In its submission to the Court regarding the disclosure of Brady material, the Government represents that it "is aware of no such material relating to any of the defendants. As stated in the Government's discovery letters to counsel, the Government is aware of its continuing obligation to disclose such material and will provide timely disclosure if any such material comes to light." (Government's Mem. P. 208.) "Courts in this Circuit have repeatedly denied pre-trial requests for discovery orders pursuant to Brady where the Government [] has made a good-faith representation to the Court and defense counsel that it recognizes and has complied with its disclosure obligations under Brady." United States v. Birkett, 1999 WL 689992 (S.D.N.Y. 1999) (citing United States v. Perez, 940 F.Supp. 540, 553 (S.D.N.Y.

-39-

1996); <u>United States v. Schwimmer</u>, 649 F.Supp. 544, 549 (E.D.N.Y.
1986); <u>United States v. Massino</u>, 605 F.Supp. 1565, 1581 (S.D.N.Y.
1985), <u>rev'd on other grounds</u>, 784 F.2d 153 (2d Cir. 1986)).  The
Court finds that defendants who request disclosure pursuant to
<u>Brady</u> have provided the Court with no valid reason to deviate from
this well-established practice.  Consequently, the Court denies
defendants' motions.


        C.    Impeachment and 3500 Material

            Several defendants move for the production of impeachment
evidence and prior statements of the Government's trial witnesses
("3500 material").  Specifically, Bozaunts seeks the disclosure of
cooperation agreements, documents and other information bearing on
the credibility of Government witnesses, prior witness statements,
and co-conspirator statements.  (Bozaunts Mem. PP. 8-10, 12-13, 14-
16.)  Gleyzer seeks some of the same discovery materials, including
information related to "the Government's favorable treatment of its
witnesses."  (Gleyzer Mem. P. 7.)  Finally, Mizhiritsky also seeks
similar information related to Roman Sosinky, his former business
partner and an alleged Government witness.  (Mizhiritsky Mem. P.
7.)

            With regard to the requested impeachment materials, the

-40-

Government represents in its submissions to the Court that it "intends to follow the long-standing practice in this District of making impeachment material available to the defense at the time it provides material pursuant to 18 U.S.C. § 3500: at least one day prior to the day the witness is called to testify on direct examination . . . . Should additional time be reasonably necessary for review, the Government will make disclosure sufficiently in advance of the witness' testimony to avoid any delay at trial." (Government's Mem. P. 212). As a general matter, "Brady [] establishes no general right of pre-trial discovery and gives rise to no pre-trial remedies. Weatherford v. Bursey, 429 U.S. 545, 559 (1977); United States v. Evanchik, 413 F.2d 950, 953 (2d Cir. 1969); Birkett at *6. In fact, "neither Brady nor any other case . . . requires that disclosure under Brady must be made before trial." United States ex rel. Lucas v. Regan, 503 F.2d 1, 3 n. 1 (2d Cir. 1974); United States v. Matos-Peralta, 691 F.Supp. 780, 790-1 (S.D.N.Y. 1988). "Due Process requires only that a defendant receive such information before it is too late for him to make beneficial use of it at trial . . . Accordingly, Brady 'impeachment' information is properly disclosed when the witness is called to testify at trial." Birkett at *6. See also United States v. Abrams, 539 F.Supp. 378, 390 (S.D.N.Y. 1982) (Brady does

-41-

not require the Government to disclose information pertaining to the credibility of a witness before the witness testifies). Based on the Government's representation, the Court finds that defendants will have adequate opportunity to prepare for cross-examination of the Government's witnesses at trial; therefore, it denies defendants' motions for production of impeachment materials prior to trial.

The Court must similarly deny Defendants' motions for early production of 3500 materials. Under the provisions of the Jencks Act, the Court has no authority to order the Government to turn over such material in advance of trial. United States v. Ramirez, 1991 WL 177239 (S.D.N.Y. 1991, Wood, J.) (citing In Re United States, 834 F.2d 283, 287 (2d Cir. 1987)).

## D.    Co-Conspirator Statements

Bozaunts also appears to request disclosure of co-conspirator statements that the Government may introduce at trial and impeachment material concerning the declarant of these statements. (Bozaunts Mem. PP. 12-14.) However, "the Second Circuit has expressly held that 'Rule 16 simply does not encompass [co-conspirator] statements, nor does the Jencks Act permit their disclosure over the objection of the Government." United States v.

-42-

Heatley, 994 F.Supp. 483, 490 (S.D.N.Y. 1998) (citing United States v. Percevault, 490 F.2d 126, 131 (2d Cir. 1974). Consequently, Bozaunts' motion is denied.

E.    Prior "Bad Act" Evidence

Defendants Bozaunts, Iousoupbekov, and Kiltinivichous request disclosure of any prior "bad acts" that the Government will introduce at trial. (Bozaunts Mem. PP. 13-14; Iousoupbekov Mem. PP. 17-18; Kiltinivichous Mem. PP. 10-12.) In its submissions to the Court, the Government responds that it "is still determining what evidence it will seek to introduce at trial . . . [but] once a final determination has been made, the Government agrees to disclose the substance of any prior bad acts sufficiently in advance of offering them so that the Court can make the appropriate rulings." (Government's Mem. P. 217.) Because the Government represents that it has not yet determined what prior "bad act" evidence it will seek to introduce at trial, and that it will provide timely notice of any such determination, the Court denies this motion.

-43-

F.    Witness List

Bozaunts also moves for a list of witnesses that the Government intends to call in its case-in-chief. (Bozaunts Mem. P. 10.)    In general, Rule 16 "does not require the Government to furnish the names and addresses of its witnesses." United States v. Bejasa, 904 F.2d 137, 139 (2d Cir. 1990). Further, "although this Court has the authority to require the government to disclose the identity of its witnesses, such an order will only be granted if the defendants make 'a specific showing that disclosure was both material to preparation of [the] defense and reasonable in light of the circumstances surrounding the case.'" United States v. Cruz, 1995 WL 617220 at *4 (S.D.N.Y. 1995) (citing Bejasa at 140; United States v. Cannone, 528 F.2d 296, 300 (2d Cir. 1975)).    "An abstract, conclusory claim that such disclosure [is] necessary," is not adequate to make the requisite showing. Id. The only reason defendant articulates to support his motion is that a witness list will allow his "trial preparation [to] be focused and facilitated, cross-examination streamlined, and time-consuming and expensive interviewing of persons to be called [] avoided." (Bozaunts Mem. P. 11.)    Such a conclusory claim is insufficient to require production of a witness list under the Second Circuit's standards, and therefore defendant's motion is denied.

-44-

G.   Disclosure of Confidential Informants

Finally, Bozaunts and Gleyzer move for disclosure of the identities of the confidential informants. (Bozaunts' Mem. P. 16; Notice of Motion of Georgiy Gleyzer ["Gleyzer Mot."], dated April 17, 2000, ¶¶ 5, 7.)  Such disclosure is not required, however, "unless the informant's testimony is shown to be material to the defense."  United States v. Saa, 859 F.2d 1067, 1073 (2d Cir. 1988), cert. denied, 489 U.S. 1089 (1989).  In support of their motion, defendants proffer nothing more than the vague assertion that "the informants are likely material participants in the alleged conspiracy . . . . Thus, their testimony will likely be highly material to the defense." (Bozaunts Mem. P. 17.)  This is insufficient to meet defendants' burden of showing that the testimony of any informants would be material to their defense. See United States v. Jimenez, 789 F.2d 167, 170 (2d Cir. 1986) (disclosure not required although informant was a participant and witness); United States v. Castro, 1995 WL 6235 (S.D.N.Y. 1995) (defendant's allegations that informants and cooperating witnesses were likely to be key prosecution witnesses and were participants in the crime charged insufficient to require disclosure). Consequently, defendants' motions are denied.

-45-

9.   **Suppression of Evidence Recovered In The Course of Consensual Searches is Not Warranted**

Several defendants move to suppress evidence recovered during searches performed after their arrests on July 9, 1998 on the ground that these searches were not "consensual." Specifically, Yukha and Gleyzer move to suppress evidence found during the searches of their apartments, Yukha and Iousoupbekov move to suppress evidence found in the Nissan Minivan, and Skvirskiy moves to suppress evidence found in his Lincoln Town Car, storage locker, and apartment. These motions are addressed in turn below.

1.   The Search of Yukha's Apartment

Yukha moves to suppress physical evidence -- including firearms and ammunition -- seized after his arrest on July 9, 1998. Yukha asserts that he never consented to the search of his apartment after his arrest, and that the "fruits" of the agents' warrantless search therefore must be suppressed. (See Yukha Mem. PP. 10-11.)

At a series of hearings held on June 12th, 13th, and 14th, 2000, the Court heard testimony from three Government witnesses who took part in the search of Yukha's apartment: Detective Shalba Gurielov, Detective David Stein, and Special Agent

-46-

Gary Uher.  The Court finds these witnesses credible.

The Court finds that (1) Yukha orally consented to the search of his apartment prior to the Government's recovery of evidence; (2) Yukha voluntarily confirmed this consent at approximately 6:20 a.m. by signing the second page of a two-page document, the first page of which was a consent to search, and the second page of which was a confirmation that nothing had been taken from him; (3) Yukha's failure to sign the first page of the consent form did not reflect a withholding of consent, and instead merely resulted from his and the agents' assumption that a signature on the form's second page sufficed to memorialize his consent to the search; (4) all three witnesses interpreted Yukha's signature on the form as a confirmation of his consent; (5) Yukha was aware that his apartment was being searched after he gave his consent; (6) Yukha's consent was not the product of any coercion on the part of the arresting agents; and (7) Yukha withdrew his consent and requested an attorney only at approximately 7:35 a.m., after recovery of the evidence defendant seeks to suppress. "It is well-settled that a warrantless search does not violate the Fourth Amendment if 'the authorities have obtained the voluntary consent of a person authorized to grant such consent' . . . and that 'so long as the police do not coerce consent, a search conducted on the

Case 1:05-cr-00774-KMW   Document 122-2   Filed 12/06/05   Page 48 of 58

basis of consent is not an unreasonable search.'" <u>Hernandez</u> at 1028, <u>quoting</u> <u>United States v. Elliot</u>, 50 F.3d 180, 185 (2d Cir. 1995); <u>United States v. Garcia</u>, 56 F.3d 418, 422 (2d Cir. 1995). Yukha's motion is thus denied.

The Court notes that, in addition, the investigating agents had a sufficient basis to conclude that Yukha consented to the search, given that Yukha had orally consented to the search and signed the second page of the consent form. This conclusion on the part of the agents provides an additional basis for denying Yukha's motion, because, as the Second Circuit has observed, "the Fourth Amendment is satisfied when [as here] . . . it is objectively reasonable for the officer [conducting the search] to believe that the scope of the suspect's consent permitted him to [conduct the search that was undertaken]." <u>United States v. Garcia</u>, 56 F.3d 418 (2d Cir. 1995) (<u>quoting</u> <u>Florida v. Jimeno</u>, 500 U.S. 248, 249 (1991) (internal quotation marks omitted)).

## 2. The Search of Gleyzer's Apartment

Gleyzer seeks to suppress evidence obtained from his apartment after his arrest on July 9, 1998. Gleyzer asserts that he "unequivocally refused" to provide either oral or written consent to search his apartment when the arresting agents asked for

-48-

his consent.  He claims that the agents ignored his refusal, continued the search of his apartment (which they allegedly had begun prior to asking for his consent), and recovered a gun which subsequently formed the predicate for a search warrant later executed on the premises.  (See Celedonio Affirmation ¶ 5.)  The Government claims that Gleyzer consented to the search of the apartment, and withdrew that consent only after becoming aware that Agent Pietrzack had found a gun.

The Government offered the testimony of two witnesses to the search to document its version of events -- Special Agent Leo Taddeo and INS Agent Eugene Kizenko.  Gleyzer offered the testimony of a third witness to the search, Special Agent Kenneth R. Pietrzack.  The Court finds these witnesses credible.

The Court finds that (1) after his arrest, Gleyzer voluntarily consented to a search of his apartment by responding in English to the agents' request, (2) Gleyzer did not suffer from any language barrier sufficient to cast doubt on the voluntariness of this consent,[9] (3) Agent Pietrzack found a gun almost immediately after being given the order to begin searching, (4) Gleyzer

---

[9]     The Court notes that Agent Kizenko -- whose role on the arrest team was to act as a Russian-English translator -- was told by defendant Gleyzer that he need not translate, because Gleyzer understood English, and that Gleyzer often responded to Agent Taddeo's questions -- which were posed in English -- either by nodding or by responding in English before Kizenko could translate.

withdrew his consent only after hearing Agent Pietrzack inform the search team that he had found a gun in the bedroom, (5) Gleyzer evidenced this withdrawal of consent by first shaking his head, then refusing to sign the agents' consent to search form, and finally responding to the agents' questioning by saying that he wanted the search to stop, and (6) the agents immediately stopped searching the apartment when he withdrew his consent.   The Court concludes that the gun found in Gleyzer's apartment was found during the course of a consensual search, and the Court denies defendant's motion to suppress the gun and the "fruit" of the later search executed pursuant to the search warrant.


    3.    The Search of the Nissan Minivan

        Yukha and Iousoupbekov move to suppress evidence found in Yukha's Nissan Minivan (the "Van") on the ground that the search of the Van was not consensual.   More specifically, Iousoupbekov asserts that, rather than giving voluntary consent, he "at best . . . acquiesced to the agents' request to search the van . . . out of fear for his personal safety. . . [and therefore] the warrantless search . . . violated Mr. Iousoupbekov's rights . . . ."   (Iousoupbekov Mem. PP. 5-6.)  Similarly, Yukha claims that "it is clear that whatever consent [Iousoupbekov] gave for the search

of the minivan was not voluntary but rather was the product of coercion by the F.B.I. agents who arrested him." (Yukha Mem. P. 9.) The Government contests these assertions and maintains that Iousoupbekov's consent was voluntary and that the fruits of the search of the Van therefore should not be suppressed.

As an initial matter, the Court notes that Iousoupbekov's consent would suffice to justify the Government's warrantless search of the Van despite the fact that Iousoupbekov was not the Van's registered owner. As the Second Circuit has explained, "there is [] nothing new in the notion that a third party may validly consent to the search of an area in which another has a reasonable expectation of privacy where the third party shares common authority over the area . . . . We have held that a third-party consent to a search will validate the search if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." United States v. Davis, 967 F.2d 84, 87 (2d Cir. 1992). The Supreme Court has clarified the meaning of "common authority" in this context: "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent

-51-

does not rest upon the law of property, [] but rests rather on mutual use of the property by persons generally having joint access or control for most purposes." United States v. Matlock, 415 U.S. 164, 172 n. 7 (1974). In this case, Iousoupbekov was given keys to the Van by Yukha, was authorized by Yukha to drive the Van, and was the last person to drive and park the Van the evening before the defendants' arrest. (See Iousoupbekov Affidavit ¶ 9; Iousoupbekov Memorandum P. 4.) Iousoupbekov had both access to the Van and "common authority" over it, and therefore could properly grant permission to the Government to perform a warrantless search. See United States v. Gradowski, 502 F.2d 563, 564 (2d Cir. 1974) (search of automobile upheld when third-party consent granted by a couple at whose house defendant had left the car and car keys).

Having found that Iousoupbekov could effectively consent to search the Van, the Court next proceeds to determine whether the consent he gave was voluntary, as the Government maintains, or coerced, as defendant maintains. At the June 12-14 hearings, three witnesses testified concerning the search of the Van: Special Agent Timothy Chapman, Special Agent Steven Chapman, and Police Officer Henry Chernyavsky. The Court finds these witnesses credible.

The Court finds that (1) after his arrival at 26 Federal Plaza, but before any questioning began, Iousoupbekov was advised

-52-

of his rights by having "advice of rights" forms read to him in English and Russian, and by his reading the English and Russian versions of these forms to himself, (2) afterwards, Agent Timothy Chapman questioned Iousoupbekov for approximately 20 minutes, at which point Agent Steven Chapman entered Iousoupbekov's interview room, (3) upon entering, Agent Steven Chapman confirmed that Iousoupbekov had been informed of his rights, (4) Agent Steven Chapman then asked Iousoupbekov if agents could search the Van, (5) Iousoupbekov responded by informing Chapman that he did not own the Van, but that he drove it on an almost daily basis, that he was the last to park the Van, and that he consented to the search, (6) Iousoupbekov then executed a form memorializing his consent, which was witnessed by both Agent Steven Chapman and Agent Timothy Chapman, (7) the atmosphere of this exchange was non-coercive: questioning was conducted in a normal tone of voice, there were no guns visible in the interview room, and there was never any mention -- as alleged by Iousoupbekov -- of threats that "things could be done the easy way or the hard way," or that the interview could "go easier or harder" on him.   The Court therefore concludes that Iousoupbekov voluntarily consented to the search of the Van, and denies Yukha and Iousoupbekov's motions to suppress evidence retrieved from during the course of the search.

-53-

4.  The Search of Skvirskiy's Lincoln Town Car, Storage
    Locker, and Apartment

Skvirskiy moves to suppress evidence obtained from his
apartment, automobile, and storage locker.  Skvirskiy asserts that
(1) the arresting agents did not possess a warrant to search his
apartment, and (2) his wife's consent to search his car and storage
locker and to seize his home computer was not knowing and
voluntary.

As an initial matter, the Court notes that Skvirskiy's
apartment was searched pursuant to a search warrant issued by
United States Magistrate Judge Peter Scuderi on July 8, 1998.  In
his submissions to the Court, Skvirskiy does not challenge the
validity of the search warrant, and instead moves to suppress
evidence obtained from the apartment solely on his mistaken belief
that his apartment was searched pursuant to his wife's consent.
Given Skvirskiy's failure to challenge Judge Scuderi's warrant, the
court denies his suppression motion with respect to all items
seized pursuant to the warrant.  Seizure of the computer, which was
beyond the scope of the warrant, and the propriety of the search of
Skvirskiy's automobile and storage locker, are addressed below.

Because the search warrant did not permit seizure of
Skvirskiy's computer or search of his automobile or storage locker,
the searches and seizures relating to them are justified only if

-54-

Skvirskiy's wife voluntarily consented to them.    The Government

presented two witnesses at the June 12-14 hearings who testified to

the voluntariness of her consent, Special Agent Marybeth Kepner,

and Special Agent Adrienne Menn.  The Court finds these witnesses

credible.

Based on their testimony and relevant exhibits, the Court

finds that: (1) although the initial conversations between the

agents performing the search and Skvirskiy's wife, Dina Golysheva,

took place in English, Golysheva informed the agents soon after the

beginning of their conversation that she was more comfortable

conversing in Russian.    Subsequent questioning -- including the

questions concerning her consent to search -- were conducted in

Russian; (2) Golysheva was presented with a copy of the search

warrant, which  was translated into Russian for her by Agent Menn;

(3) Golysheva was then asked where Skvirskiy's other personal items

might be located, in response to which she told the agents of the

existence and location of the storage locker and automobile; (4)

Golysheva was then given a consent to search form in English, which

was translated into Russian by Agent Menn; (5) Agent Menn informed

her at this time that she could refuse to grant consent, and if,

after obtaining her consent, the agents found evidence during the

search, these objects would be taken by the agents; (6) Golysheva

then consented to the search and signed a consent form, which Agent Menn had translated into Russian for her; (7) after completion of the apartment search, Golysheva voluntarily consented to agents taking a computer from the apartment, signed the second page of a consent to search form, and indicated in her own handwritten note on the consent form that she so consented. This handwriting was then witnessed by Agents Menn and Kepner; and (8) although Golysheva was upset at the arrest of her husband and during the search, she was not too upset to understand the effect of her consent. Her consent was voluntary. The Court denies Skvirskiy's motion to suppress.

## 10. Suppression of Iousoupbekov's and Bozaunts' Post-Arrest Statements Is Not Warranted

Both Iousoupbekov and Bozaunts made post-arrest statements that they now move to suppress. Iousoupbekov admits that he was given Miranda warnings during his questioning at 26 Federal Plaza prior to making his statement, but argues that his statement should be suppressed because his waiver was the product of coercion by federal agents. (Iousoupbekov Memorandum P. 10.)[10]

---

[10] The Court notes that Iousoupbekov also classifies his consent to search the Nissan minivan as a post-arrest "statement," and seeks to suppress this "statement" because it is the product of Government "coercion." As described above in Section 9(c), however, the Court finds that Iousoupbekov voluntarily consented to

-56-

defense counsel, the Court credits these witnesses' testimony.[12]
The Court finds that (1) Bozaunts made only one request to speak to
a lawyer during his interview, and (2) the agents immediately
ceased their questioning of defendant upon his request for an
attorney.   Consequently, the Court denies Bozaunts' suppression
motion as well.

---

[12]    The Court notes that Agent Thomas' testimony did contain
a minor inconsistency.  Specifically, Agent Thomas testified that
the initial telephone call he made at approximately 6:00 a.m. to
Apartment TSO to announce the presence of the arrest team was made
in both English and Russian.  The recording made of this telephone
call reflects that his announcement was made only in English.
However, the Court finds that this does not undermine the
credibility of Agent Thomas' testimony with regard to Bozaunts'
questioning at 26 Federal Plaza.  Given the stress associated with
the impending arrest, the lapse of two years' time between the date
of the arrest and the hearing date, and the fact that Agent Thomas
conversed in English and Russian throughout his interaction with
defendants, the Court finds that Agent Thomas simply misremembered
in which language he spoke when making the initial arrest phone
call.

## III.   CONCLUSION

For the reasons stated above, defendants' motions are hereby denied.

SO ORDERED

DATED:   New York, New York
         July  _10_  , 2000

                                        _____
                                          KIMBA M.  WOOD
                                        United States District Judge


Copies of this Order have been mailed to counsel for the parties.