# NEW YORK COUNCIL OF DEFENSE LAWYERS

Co-Sponsored by Holland & Knight LLP

## A PRACTICAL GUIDE TO DEALING WITH COOPERATORS

November 18, 2004
Ceremonial Courtroom
500 Pearl Street

### DEVELOPMENTS IN THE LAW
### RELATING TO COOPERATING WITNESSES

I.      Brady/Giglio

    A.      Current Second Circuit *Brady/Giglio* Formulation, *United States v.*

       *Rivas, 2004 WL 1658368 (2d Cir. July 26, 2004)*:

> "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).* Impeachment evidence is evidence "having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." <u>*United States v. Avellino, 136 F.3d 249, 255 (2d Cir.1998)*</u>. Materiality of *Brady* evidence is established when there is a reasonable likelihood that disclosure of the evidence would have affected the outcome of the case, *United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985),* or would have put the case in such a different light as to undermine confidence in the outcome, *Kyles v. Whitley, 514 U.S. 419, 434-35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).*

The standard applies whether or not any demand has been made, *United States v. Bagley, 473 U.S. 667 (1985).*

**B.     The Scope and Timing of the Required Disclosure:**

As stated in *United States v. Coppa, 267 F.3d 132, 141 (2d Cir. 2001)*

> "*Bagley* made explicit what *Agurs* foreshadowed: that 'material' in the *Brady* context does not mean material in the evidentiary sense, as *Brady* seemed to suggest. Rather, evidence is material in the *Brady* context only if "its suppression undermines confidence in the outcome of the trial."

The prosecutor must disclose "material" *Brady/Giglio* information, as defined above

> "no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made." *Coppa*, at 142.

The defendant must receive that information "in time for its effective use" Id. at 144. See also *Kyles v. Whitley, 514 U.S. 419, 437 (1995).*

Although most defense lawyers would certainly disagree, the opinion in Coppa expressed no concern that pre-trial compliance with the *Brady/Giglio* standard as the Supreme Court and *Coppa* have re-defined it was likely to result in fewer pre-trial disclosures.  To the contrary, the

Court believed prosecutors to be "readily able to observe the applicable standards". Id. at 144.

C.    **Some recent Brady/Giglio Applications:**

**Paid informant status.** *Banks v. Dretke, 124 S.Ct. 1256 (2004)* (paid status of witness must be disclosed and identity of non-testifying informant must be disclosed if informant could have amplified or contradicted the testimony of government witnesses.)

**Prior statements/interviews of government witnesses.** In *United States v. Rivas*, 2004 *WL 1658368 (2d Cir. July 26, 2004)*, a very fact-specific decision, failure to disclose a government witness's statements that were not inconsistent with his trial testimony was held to violate due process under the "reasonable likelihood" standard.

II.    **Government Witness Perjury**

A.    **Second Circuit Law.**   When a prosecutor knowingly elicited false testimony (or knowingly left it uncorrected), it used to be clear in the Second Circuit that "reversal is 'virtually automatic'", *United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991); United States v. Stofsky, 527 F.2d 237, 245-46 (2d Cir. 1975). In United States v. Napue 360 U.S. 244, 269 (1959),* the Supreme Court took essentially the same position where the witness's known lie related to a credibility issue--whether he had been compensated for his testimony. In such cases, the Supreme Court required

15

reversal where such false testimony merely "may have affected" the outcome of the trial.[1]

Slicing it fine, the Second Circuit said in *Wallach,* at 702, that where the government only "should have known" of the falsity, the standard is the significantly more prosecution-friendly *Brady* and *Giglio* "reasonable likelihood" of an effect on the outcome. See, recently declining to reach the question, *Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003).*

In *Jenkins v. Artuz, 294 F.3d 284 (2d Cir. 2002),* however, the Second Circuit applied this same "reasonable likelihood" standard to a prosecutor's <u>knowing</u> use of perjury, apparently turning its back on *Stofsky* and *Wallach's* tougher standard.

Where the government is unaware of the perjury at trial, this Circuit requires a defendant to demonstrate that "but for the perjured testimony, [he] would most likely not have been convicted." *Channer v. Brooks, 320 F.3d 188, 196 (2d Cir. 2003).*

---

[1] Government witness perjury may also deprive a defendant of the Sixth Amendment right to confrontation. *See United States v. Simmons, 964 F.2d 763, 769-770 (8th Cir. 1992).*

B.    **Recent False Testimony Relief.** *United States v. D'Angelo, 2004 WL 315237 (E.D.N.Y. February 18, 2004)* (Gleeson, J) (verdict set aside where three co-conspirators committed "rampant perjury" as to which the prosecution was "at the very least negligent"): *United States v. Hiruko, 320 F.Supp.2d 26 (E.D.N.Y. 2004)* (Gleeson, J.) *United States v. Big Apple Bag Co., Inc., 306 F.Supp.2d 331 (E.D.N.Y. 2004)* (in each case, evidence suppressed where FBI agent/ police officer testified falsely). [2]

*United States v. Martha Stewart, 2004 WL 1520527 (July 8, 2004)*, (new trial denied where, assuming secret service agent gave false testimony, no prejudice occurred); *United States v. Schmidt, 373 F.3d 100 (2d Cir. 2004)* (motion to withdraw pleas denied where, although affidavit in support of search warrant was false, the government disclosed falsity before plea; motion to withdraw plea was not based on a claim of "actual innocence", and plea was knowing and voluntary.

III.   **Government Use of Cooperation Agreements At Trial to Establish A Cooperator's Motive to Testify Truthfully[3]**

A.    **A Cooperator's Motive to Lie.** Since long before federal prosecutors started using cooperation agreements in the 1970s, and continuously

---

[2] For a discussion of these cases, see "Perjury Government Witnesses: Exposed and Published by Elkan Abramowitz and Barry Bohrer", NYLJ, July 6, 2004.

[3] See NYCDL member Jay Goldberg's November 5, 2003 NYLJ Article "Government Witness Cooperation Agreements: A Defense Perspective" and Lawrence Stern's May 17, 2004 NYLJ Article "The Jury Charge that Confirms Prosecutorial Vouching", from which most of the citations in this section are drawn.

thereafter, courts have consistently recognized that a cooperating witness who is facing sentence has a motive to falsely inculpate (or over-implicate) the defendant in the hopes of putting it past the prosecutor and obtaining a sentencing benefit. E.g., *United States v. Arroyo-Angulo, 580 F2d 1137, 1148 (2d Cir 1978)*, stating "the obvious motivation of [the cooperating defendant] to lie to save his own neck"; *United States v. Bagley, 473 U.S. 667, 683 (1985)*. Undoubtedly because defendants who cooperate to the government's satisfaction have so routinely over the years obtained significant sentencing benefits as a result, a defendant seeking to argue, and get an instruction on, a cooperating witness's motive to lie need establish only that the witness is awaiting sentence and is never required to prove the historical relationship between cooperation and sentence reduction.

**B.**   **Does a Witness Who Has Signed a Standard Cooperation Agreement Have a Motive to Tell the Truth?**   In standard cooperation agreements, the cooperator expressly agrees that if the prosecutor believes his information or testimony has not been truthful, the government can terminate the agreement, decline to provide a 5K1 letter, and prosecute the cooperator for all available crimes including perjury. Since the advent of these agreements, courts in this Circuit have uniformly held, without analysis, that once the defense raises in any way at trial a cooperator's universally acknowledged motive to falsely inculpate the defendant, the prosecution can get this provision in evidence, argue the witness's motive

18

to tell the truth as a result of it, and get an instruction to that effect. E.g., *United States v. Vergara, 73 Fed.Appx. 478 (2d Cir. 2003); United States v. Cosentino, 844 F.2d 30, 32-35 (2d Cir. 1988); United States v. Arroyo-Angullo*, above.

However, whether signing an agreement with this provision can reasonably be expected to create <u>any</u> real motive/interest in the cooperator not to falsely inculpate or at least significantly exaggerate the guilt of a co-defendant is very doubtful. Defendants who provide significant incriminating testimony quite uniformly obtain a sentencing benefit, without, of course, any determination that they actually told the truth. Thus in this Circuit (at least), there appear to have been almost no instances in which, since use of the agreement was initiated (at least), the government has discovered that a cooperator gave false inculpatory information or testimony against the defendant, and for that reason has voided a cooperation agreement, resulting at the least in no 5K1 letter or in that plus the cooperator's prosecution.

An additional reason for excluding this provision of the cooperation agreement is that its admission unavoidably carries with it an at least implicit improper vouching by the prosecutor for the cooperator's credibility. As stated in *United States v. Brown, 120 F.2d 1059 (9th Cir. 1981)*:

> "The suggestion is that the prosecutor is forcing the truth from his witness and the

> unspoken message is that the prosecutor knows what the truth is and is assuming its revelation".

See also *United States v. Frances, 1790 F.3d 546, 550 (6th Cir. 1998).*

In these circumstances, defense counsel might well seek in the right case to re-open the admissibility question. The ground would be to urge the court that that this agreement provision cannot be accepted to establish a motive to tell the truth without the government at least meeting the burden of providing evidence that thirty years' experience under this provision have in fact resulted in some significant number of discoveries that cooperators falsely inculpated defendants and that their sentences suffered for it.[4]

C.    **Prosecution Misuse of the Cooperation Agreement in Summation.**

The greatest vice in admitting the cooperator's agreement that he can suffer harm if he lies is in the non-fact-based use that the government has been allowed to make of the agreement on summation. For example, in *Arroyo-Angullo*, above, the Second Circuit's most frequently cited decision approving the government's offer of the "truth telling" portions of cooperation agreements, the majority expressed no disapproval of a common enough summation in which (among other similar language) the

---

[4] Prosecutors routinely get in evidence another cooperation agreement provision in which the government expressly promises the opportunity for a sentencing benefit from the judge if the cooperator satisfies the government that he has rendered substantial assistance and has testified truthfully. This opportunity for a reduced sentence in return for truthful testimony cannot be said to provide <u>any</u> truth-telling motive/interest in a witness who already plans to give truthful testimony, and thus adds nothing to whatever truth-telling incentive one could argue is the result of the above-discussed provision referring to possible consequences of deliberate <u>false</u> testimony.

assistant said "[He's] motivated to tell the truth precisely to help himself.
<u>If he lies there is no agreement, there is no reduction of sentence. He's</u>
<u>prosecuted...[He] has no choice.</u>" (Emphasis added)  Likewise see *United*
*States v. Thomas*, *1996 WL364553 (2d Cir. 1996) (Unpub. Op.)*, another
stark example of the Circuit's apparent disinterest in focusing on the
reality of cooperating witness motivations: "[T] he prosecution ['s
summation] merely [!!] emphasized that...the witnesses could only [!!]
benefit from the cooperation agreements by telling the truth".

However, once again at least in this Circuit, there is no established history
of any cause and effect relationship between what the agreement says and
bad consequences to the witness if he lies. In stating that there is, whatever
the form of words, the prosecutor is simply (a) testifying not subject to
cross-examination, and in doing so (b) presenting as fact something
known to have no basis in fact—that prosecutors discover witness perjury
with some frequency, and that when they do, the axe falls.

In a concurring opinion in *Arroyo-Angulo*, Judge Friendly was for these
very reasons highly--and surely correctly--critical of the Court's
acceptance of the summation quoted above:

> "Such remarks are prosecutorial overkill.
> They inevitably give jurors the impression
> that the prosecutor is carefully monitoring
> the testimony of the cooperating witness to
> make sure that the latter is not stretching the
> facts, something the prosecutor usually is
> quite unable to do; that any significant
> exaggeration by the witness of what the

prosecutor believes to be the truth will cause the latter to refrain from writing the promised memorandum recommending leniency; and, perhaps worst of all, that an acquittal may involve serious consequences to the witness by releasing the Government from its promise or even by causing an indictment for perjury.

\*\*\*

If proper objection had been made to the summation, the judge should have sustained it; if matters had gone too far to make a striking of the remarks an effective cure the judge should have instructed that the promise in the cooperation agreement adds little to the truth-telling obligation imposed by the oath; that the prosecutor often has no way of knowing whether the witness is telling the truth or not; that the books are not filled with perjury indictments of Government witnesses who have gone beyond the facts; and that an acquittal would not mean that as a matter of course the Government would seek such an indictment or even fail to make its promised recommendation of leniency. If prosecutors know that such instructions will be given, they will hardly be tempted to the excesses committed here".

**D.**    **Jury Instructions on the Use of Prosecution Agreements.**  Once a

cooperation agreement is in evidence, some correct, balanced instruction

is necessary.  One charge to seek to reformulate is certainly the following

standard <u>Sand & Siffert</u> Charge 7-5, as quoted in the Second Circuit's

helpful decision in *United States v. Prawl, 168 F.3d 622, 628 Fn. 3*:

Accomplices Called by the Government

"You have heard witnesses who testified
that they were actually involved in planning
and carrying out the crime(s) charged in the
indictment...

...[A]ccomplice testimony is of such nature
that it must be scrutinized with great care
and viewed with particular caution when
you decide how much of that testimony to
believe.

You should ask yourselves whether these so-
called accomplices would benefit more by
lying, or by telling the truth.  Was their
testimony made up in any way because they
believed or hoped that they would somehow
receive favorable treatment by testifying
falsely?   Or did they believe that their
interests would be best served by testifying
truthfully?  If you believe that the witness
was motivated by hopes of personal gain,
was the motivation one that would cause
him to lie, or was it one that would cause
him to tell the truth?  Did this motivation
color his testimony?"

The last paragraph presents as pretty much a toss-up for the jury's choice

the question of whether an accomplice is more motivated to lie or tell the

truth by the hoped-for benefit of "favorable treatment".  However, the

proposition that any punishment for lying, let alone any benefit for

truth-telling, would be a factor motivating the cooperator to tell the truth is

very arguably so insubstantial in comparison with the universally

acknowledged hope of gain from perjury that this charge can fairly be

challenged as an improper one.

A proper charge covering this entire area might be put in the following or similar language:

> "You have heard that the prosecution and [the cooperator] entered into a cooperation agreement in which certain promises were made on each side relating to testimony by the cooperator.
>
> [Briefly summarize U.S. Attorney's core current agreement provisions in evidence as discussed above].
>
> [Y]ou should bear in mind that a witness who has entered into such an agreement has an interest in this case different from that of any ordinary witness.   A witness who realizes that he may be able to obtain his own freedom or receive a lighter sentence by giving testimony favorable to the prosecution has a motive to testify falsely. [Sand and Siffert].
>
> This possibility of a reduced or no sentence if the AUSA writes a 5K1 letter to the court, stating that the witness has given truthful testimony and substantial cooperation, gives the witness a direct, personal stake in respondent's conviction. [Sand and Siffert] The fact that the opportunity for a lesser sentence was not simply guaranteed in the agreement, but was expressly made contingent in the agreement on the government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction. [*United States v. Bagley, 473 U.S. 667, 683 (1985)*].
>
> However, there is no basis in this record for concluding that the promised benefit of the opportunity to receive a lighter sentence for testifying truthfully against the defendant has itself provided any incentive for truthful testimony.

24

As for the possibility that testimony falsely implicating the defendant might be discovered by the government resulting in [the cooperator] losing the benefits of the cooperation agreement and being prosecuted for all other possible crimes and for perjury, that possibly might to some degree, provide a motive for truthful testimony. However, I caution you that there is nothing in the record indicating that such adverse consequences to a falsely testifying cooperator happen with any frequency at all. Thus there is nothing to indicate that the prosecutor would have any way of discovering any such false testimony, or that even if he/she did that it would result in the cooperator's loss of the benefits of the cooperation agreement or in his indictment for any other crimes he has committed and for perjury. [Judge Friendly's concurring opinion in *Arroyo v. Angullo*, above].

Nor is there anything in the record indicating that [the cooperator] had any belief that in fact such consequences typically do take place".

Where (despite defense objections and mistrial requests) the prosecutor has summed up with language expressly or impliedly vouching for the cooperator's credibility as described above, the following instruction should be appropriate:

I further instruct you that the prosecutor's reference to [substance of express or implied vouching] was entirely improper and that you must ignore it. Whether or not the prosecutor personally has any degree of confidence in the truthfulness of any witness's testimony, including [the cooperator], is entirely irrelevant to your

own assessment of credibility, which is the
only assessment that matters in this case.

    E.    **Expert testimony on benefits/adverse consequences to cooperators.**
*United States v. Henry, 71 Fed.Appx. 493 (6th Cir. 2003)* collects cases
holding that whether a cooperating defendant has a motive to lie is not a
proper subject for expert testimony.  However, expert testimony on the
absence of a history of adverse consequences to lying cooperators, or
(depending on the cooperator's testimony on this subject) on the top
guideline sentence he is facing, might succeed.  *United States v. Johnson,
297 F.3d 845 (9th Cir. 2002)* (no prejudice even if exclusion of expert
testimony on likely sentences of cooperators under Guidelines was abuse
of discretion).

**IV.    <u>F.R.Cr.P. Rule 17(c) Defense Subpoenas to Third Parties:</u>**

    Is there any way around the conventional judicial wisdom that a 17(c)
subpoena must describe <u>specific</u> documents <u>that are admissible</u>, and that it
does not require production of even admissible documents if they are
solely to be used for <u>impeachment</u>?  Based on the arguments, if not the
holdings referred to below, it remains worth pressing a somewhat wider
scope for these subpoenas.

    A.    **Admissibility.**  For many years the cases have routinely held that Rule
17(c) is not a discovery device and that the subpoena must identify
admissible documents.  E.g., *United States v. Cherry, 876 F.Supp. 551,
552 (S.D.N.Y. 1995, Haight J.), <u>United States v. Nektalov</u>, 2004 WL157
4721 (S.D.N.Y. 2004)*.  Nevertheless, that result is not dictated either by

the Rule itself (setting forth as reasons for quashing only that compliance would be "unreasonable or oppressive") or by *United States v. Nixon, 418 U.S. 683, 699-700 (1974)*, the always-relied-on basis for requiring that the subpoenaed documents be admissible.    *Nixon* did not involve a defendant's subpoena to a third party.  The Court not only emphasized strongly that the granting of a 17(c) subpoena rests within the trial court's discretion, 418 U.S. at 702, but also expressly <u>declined to decide</u> whether a more relaxed standard should apply to such third party subpoenas.  418 U.S. at 700, n. 12.

In *United States v. Nachamie, 91 F.Supp.2d 552, 563 (S.D.N.Y. 2000)*, Judge Scheindlin wrote persuasively in dictum that

> "A real question remains as to whether it makes sense to require a defendant's use of <u>Rule 17(c)</u> to obtain material from a non-party to meet [the <u>Nixon</u>] standard.  Unlike the Government, the defendant has not had an earlier opportunity to obtain material by means of a grand jury subpoena.  Because the Rule states only that a court quash a subpoena 'if compliance would be unreasonable or oppressive,' the judicial gloss that the material sought must be evidentiary--defined as relevant, admissible and specific [<u>Nixon</u> at 700]--may be inappropriate in the context of a defense subpoena of documents from third parties.  As one court has noted, 'The notion that because <u>Rule 16</u> provides for discovery, <u>Rule 17(c)</u> has no role in the discovery of documents can, of course, only apply to documents in the government's hands; accordingly, <u>Rule 17 (c)</u> may well be a proper device for discovering documents in the hands of third parties'.  <u>United States v.</u>

Tomison, 969 F.Supp. 587, 593, fn. 14 (E.D.
Cal. 1997). If this is so, then the only test for
obtaining the documents would be whether
the subpoena was: (1) reasonable, construed
using the general discovery notion of
'material to the defense;' and (2) not unduly
oppressive for the producing party to
respond."

**B.**     **Impeachment Documents.**     *Nixon* says, at 702, that "generally",
documents to be used solely for impeachment are not producible, and that
has become the standard ruling.  E.g., *United States v. Cherry*, above at
553; *United States v. Nektalov*, above.  The only case *Nixon* cites is a 1954
D.C. District Court opinion on a 17 (c) subpoena directed to <u>the
government</u> for witness statements and in fact holding that "Rule 17(c) is
applicable only to such documents or requests as would be admissible in
evidence at the trial, <u>or which may be used for impeachment purposes</u>".
*United States v. Carter, 15 F.R.D. 367, 371* (emphasis added).

The repeated reason for excluding impeachment documents is that their
admissibility cannot be determined until the witness testifies.  E.g., *United
States v. King, 194 F.R.D. 569, 574 (E.D.Va. 2000)*, (collecting the cases,
but holding that "where it is known with certainty before trial that the
witness will be called to testify, the admissibility determination...can be
made before trial").  See *United States v. Weissman, 2002 WL 31875410
(S.D.N.Y. 2002)* (Jones J., <u>quoting that proposition with approval</u>.  *King*
and *Weissman* certainly give room for subpoenaing from third parties'
reasonably identifiable documents usable only for impeachment of

28

cooperating witnesses whom there is every reason to believe, before trial, that the prosecution must call. Such impeachment documents may be admissible, but even if not, it is hard to maintain persuasively that a defendant should not get them if they are sufficiently identifiable to overcome an objection that the subpoena is "unreasonable or oppressive" fishing.

C.  **Government standing to object to subpoenas for documents relating to cooperating witnesses.**   Also in _Nachamie_, at p. #160, Judge Scheindlin again wrote favorably to the defense where the government claimed standing to object to a subpoena to its witnesses for their documents, first emphasizing at 558 that a party generally does not have standing to challenge a third party 17(c) subpoena absent a claim of privilege or a "proprietary" or other legitimate "interest" in the subpoenaed items.   Judge Scheindlin then denied standing to the government, emphasizing: (1) the subpoenaed parties had not been identified as government witnesses; (2) they were not "potential witnesses in a case involving grave violence or threats of violence"; (3) the government claimed no work product in other privilege or proprietary interest in the documents; and (4) the government's argument that it had standing as a "representative" of the subpoenaed parties (likely doctor witnesses in a Medicaid fraud case) failed because (a) the witnesses had not supplied all their documents to the government to act as their "representative"; and (b) the government's interests were different from

29

those of its witnesses, and it thus would be "inappropriate" for it to act as their counsel.   Nevertheless, the Court considered the merits of the government's application on the ground that "before a Court issues a Rule 17(c) subpoena, it must be satisfied that the subpoena complies with the requirements of the rule".

**V.**     *Almeida, Stepney et al*: **When a Member of a Joint Defense Agreement Becomes a Cooperator**

An attached <u>Business Crimes Bulletin</u> article co-authored by NYCDL Board Member Jaqueline Wolff and former EDNY U.S. Attorney Alan Vinegrad very thoughtfully analyzes *United States v. Almeida, 341 F.3d 1318 (11ᵗʰ Cir. 2003* and *United States v. Stepney, 246 F.Supp.2d 1069 (N.D. Cal. 2003)*, two recent decisions holding that a client-party to a joint defense agreement who subsequently testifies for the government may be cross-examined by a lawyer who was himself a member of the agreement representing another client party about statements made by the witness in the joint defense setting.[5]

**VI.**     <u>Crawford v. Washington, Barring "Testimonial" Out- of-Court Statements</u>

In *Crawford v. Washington,* 124 S.Ct. 1354 (2004), the Supreme Court held that unless a witness is unavailable and a defendant had a prior opportunity to cross-examine, "testimonial" out-of-court statements are barred by the Confrontation Clause, whether or not such statements are

---

[5] The <u>Bulletin</u>'s permission to reproduce this article here is greatly appreciated.

deemed reliable.   In *Crawford,* the barred out-of-court statements consisted of the defendant's wife's description of the crime to the police.

In *United States v. Saget,* 2004 WL 1682772 (2d Cir. 2004), the Circuit followed up on *Crawford's* explanation of the meaning of "testimonial" (itself derived from the 6th Amendment):

> "'Testimony' [is] '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" 124 S.Ct. at 1374. Although the [Supreme] Court declined to "spell out a comprehensive definition of 'testimonial,'" Id. at 1374, it provided examples of those statements at the core of the definition, including prior testimony at a preliminary hearing, previous trial, or grand jury proceeding, as well as responses made during police interrogations. See id. at 1364, 1374. With respect to the last example, the Court observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. at 1364. Thus, the type of statements cited by the Court as testimonial share certain characteristics; all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings. See id. at 1365 n. 4 (stating that declarant's "recorded statement, knowingly given in response to structured police questioning," was made in an interrogation setting and was therefore testimonial), (emphasis added).

*See United States v. Bruno (Fortunato),* 2004 WL 2039421 *7-11 (2d Cir. Sept. 14, 2004) (barring admission of plea allocution and grand jury testimony of unavailable witnesses); *United States v. Wilmore,* 2004 WL 1886463 (9th Cir. Aug. 25, 2004) barring admission of grand jury testimony of witness who asserted 5th); *United States v. Jones,* 371 F.3d 363 (7th Cir. 2004) (*Crawford* applied so as to bar admission of non-testifying co-conspirator's confession).

B.   **Non-"Testimonial" Statements Not Subject To The New Rule.** *See United States v. Reyes,* 362 F.3d 536 (8th Cir. 2004) (co-conspirator's statements to undercover agents not affected by *Crawford*); *United States v. Manfre,* 368 F.3d 832 (8th Cir. 2004) (same, statements made to half-brother); *Horton v. Allen,* 370 F.3d 75 (1st Cir. 2004) (same, statements to third party); *United States v. Lee,* 374 F.3d 637 (8th Cir. 2004) (same) *Leavitt v. Arave,* 371 F.3d 663 (9th Cir. 2004) (victim's statements to police about the defendant the night before she was killed not testimonial); *Delarosa v. Bissonette,* 2004 WL 1563269 (1st Cir. 2004) (testimony by officer as to information from informant not admitted for truth; *Crawford* therefore not applicable);

C.   ***Crawford* and *Bruton*.** *See United States v. Eldridge,* 2004 WL 1836103 (9th Cir. Aug. 13, 2004) (admission of statements of co-defendant at joint trial not plain error and permissible against co-defendant).

D.   **Harmless Error Rule Applies.** *See United States v. McClain (Guastella),* 2004 WL 1682768 (2d Cir. 2004).

**VII.**         **The AFDA Rat Manual**

Finally, see the informative, albeit principally focused on 9th Circuit and California law; Updated Rat Manual: Finding Evidence to Search for and Undermine the Snitch, by Charles M. Sevilla, Esq. and Verna Wefald, Esq. (updated 2001) AFDA: http://www.afda.org on the AFDA home page, click BRIEF BANK, then click TRIAL. The Rat Manual is posted in four parts, due to its large size. The Topic Headings are:

I.      Finding out before it's too late if there's a rat
II.     What to do when you know he/she is a snitch
III.    Dealing with the snitch
IV.     Collating the information for areas of attack
V.      Grounds for dismissal
VI.     The jailhouse informant
VII.    Expert witness
VIII.   Jury instructions
IX.     Post-conviction motions
X.      Miscellany: other useful quotes

# 2381682_v1

33

# LJN Business Crimes Bulletin®

LAW JOURNAL
NEWSLETTERS

Volume 10, Number 10 • November 2003

ALM

## Court-Imposed Waiver of the Joint-Defense Privilege

**By Jacqueline C. Wolff and Alan Vinegrad**

Most defense attorneys enter into joint-defense agreements with the understanding that even if one of the signatories decides to withdraw from the agreement and cooperate with the government, the confidentiality provisions survive. Such agreements routinely include language like this:

"In the event that any client … engages in negotiations or enters into any agreement with any third party that is in any respect … inconsistent with the continued sharing of information under this Agreement, such client shall be deemed to have withdrawn from this Agreement and shall refrain from disclosing to the third party any joint-defense materials.

No attorney who has entered into this Agreement shall be disqualified from cross-examining any client to this Agreement … because of … [this] Agreement; however, nothing herein shall permit any attorney to cross-examine another attorney's client utilizing any joint-defense material contributed by that client."

Two recent decisions — by the Eleventh Circuit and the Northern District of California — have called provisions like these into question: *United States v. Almeida*, 341 F.3d 1318 (11th Cir. 2003); and *United States v. Stepney*, 246 F. Supp.2d 1069 (N.D. Cal. 2003). Any defense attorney who is considering entering into such an agreement should think twice — especially if some party may choose, down the road, to cooperate with the government.

For years it has been well established that "a joint defense agreement cannot be waived without the consent of *all* parties to the privilege" since allowing unilateral waiver "would 'whittle away' the privilege." *United States v. Weissman*, 1996 WL 737042 at *26 (S.D.N.Y. Dec. 26, 1996) (emphasis added); *In the Matter of Grand Jury Subpoena Duces Tecum Dated November 16, 1994*, 406 F. Supp 381, 394 (S.D.N.Y. 1975). Further, "a waiver by one party to a joint defense agreement does not waive any other party's privilege over the same communications." *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 213 B.R. 433, 436 (S.D.N.Y. 1997). The only exception is when the parties subsequently become adversaries in litigation. *Id.* Even then, the waiver is only as to each other.

### STRATTON OAKMONT

In *Stratton Oakmont*, the government argued that it was entitled to joint-defense material because the parties to the joint defense agreement became adversaries in a subsequent litigation. The court rejected the government's argument, stating the fact that the signatories had become adversaries did not mean that the "rest of the world suddenly becomes entitled to privileged information." *Id.* at 438.

Under the standard no-waiver provision, a client runs the risk of having his or her attorney disqualified because of an inability to use joint-defense information during cross-examination. Nevertheless, courts have generally not second-guessed the client's assumption of this risk. Potential defendants are so disadvantaged vis-à-vis the government in evidence-gathering that the risk of potentially losing one's lawyer is small compared with the risk of not having the facts with which to prepare an effective defense. Indeed, at least one court has even deemed the acceptance of this risk tantamount to a waiver of any conflict. *United States v. Anderson*, 790 F. Supp. 231, 232 (W.D. Wash. 1992).

### THE STEPNEY AND ALMEIDA CASES

The *Stepney* and *Almeida* decisions, however, chart a very different course. Both cases held that when a party to a joint-defense agreement testifies on behalf of the government, that party may be cross-examined with statements he or she made pursuant to the joint-defense agreement.

In *Stepney*, the government charged almost 30 defendants in a series of indictments with 70 counts, including participation in a street gang. Defense counsel, some of whom had never met prior to the indictments, entered into joint-defense agreements to try to prepare a coherent defense to this massive case. In order to ensure that each of the defendants' Sixth Amendment rights were protected, the court ordered that any joint-defense agreements would have to be memorialized in writing and submitted for *in camera* review.

The agreement provided that any signatory could withdraw at any time, each signatory accepting the risk that his or her attorney might then be conflicted out of representing him or her at trial. The court recognized that in this type of multi-defendant case, deals with the government could occur at any time for any number of defendants and enforcing disqualification could create a revolving door of attorneys leading to adjournments and prejudice to all parties. Were one party

to testify for the government, *all* the remaining defense attorneys could be disqualified.

The court also rejected the standard provision in which the signatories simply agree not to use joint-defense information to cross-examine a party who withdraws from the agreement. "This method of waiving conflict … stands in tension with the general principle that where an attorney has actually obtained confidential information relevant to her representation of a client, the law presumes she cannot avoid relying on the information — however indirectly or unintentionally — in forming legal advice and trial strategy." 246 F.Supp.2d at 1085. Instead, the court, citing the ALI-ABA model joint-defense agreement, ruled that any signatory who withdraws from a joint-defense agreement and testifies may be cross-examined with any material he contributed to the joint defense and that joint-defense agreements "must contain" a provision specifically waiving confidentiality should a signatory choose to testify.

*Almeida* involved two parties to a joint-defense agreement, one of whom decided to cooperate with the government. At trial, the attorney for the non-cooperating defendant sought to cross-examine the cooperator with statements he made during joint-defense meetings. The government objected on the grounds of the joint-defense privilege. The witness, while not revealing joint-defense material, conceded to the court that the information would be useful both in cross-examining him and in locating defense witnesses. Nonetheless, the court sustained the objection. After the defendant was convicted, the cooperator revealed that the defendant was, in fact, not guilty and that he had told the defendant's attorney as much during a joint-defense meeting.

The Eleventh Circuit, citing *Stepney*, reversed. The court said the "justification for protecting the confidentiality" of joint-defense communi-

cations "is weak" and that "little can be gained by extending the [attorney-client] privilege" to joint defense communications." 341 F.3d at 1324. The court only grudgingly acknowledged that "in light of the vast resources of the government" it is "perhaps appropriate" that co-defendants be allowed to exchange information confidentially.

The court then went on to rule that, when a party to a joint-defense agreement later testifies for the government, he may be cross-examined with his joint-defense communications. Citing a 1957 A.L.R. article and a 115-year-old Michigan case, the court concluded that it is an "ancient rule" that, when a defendant turns state's evidence, he waives any privilege he may have had with his *own* attorney. Although the court stopped short of ruling that accomplices *always* waive the privilege when they testify for the government, it did hold that, "when each party to a joint defense agreement is represented by his own attorney, and when communications by one co-defendant are made to the attorneys of the other co-defendants, such communications do not get the benefit of the attorney-client privilege in the event that the codefendant decides to testify on behalf of the government in exchange for a reduced sentence." In a footnote, the court stated that "[i]n the future" defense attorneys "should insist" that joint-defense agreements contain a "clear statement of the waiver rule enunciated in this case[.]"

The implications of these decisions are potentially far-reaching. Whereas in the past the courts left it up to the parties to decide what risks they were willing to accept in signing joint-defense agreements, the *Stepney* and *Almeida* courts have stepped in and pronounced which waivers they believe are acceptable, even going so far as to require defense counsel to include such provisions in their joint-defense agreements.

Although these rulings may avoid the sort of injustice that occurred in *Almeida* by enabling defense counsel to show that a government cooperator is simply fabricating a story to

help himself, the justification for the judicial altering of the balance of benefits and risks inherent in joint-defense agreements is open to question. Why not enforce an agreement that permits withdrawal without any risk of disqualification by limiting the use of joint-defense statements in cross-examination?

## OTHER CONCERNS

Other concerns were not even addressed in these decisions. How will a prosecutor fully debrief a cooperator about his or her joint-defense statements in order to be prepared for any potential impeachment on cross-examination? Won't he or she need to know the other side of the conversation to understand the cooperator's statements fully? Will a prosecutor use *Stepney* and *Almeida* to justify obtaining *all* the joint-defense communications?

Moreover, the rulings may jeopardize the privilege of a *non-cooperating* defendant who testifies on his or her own behalf. Indeed, the court in *Stepney* ruled that its mandatory waiver provision covers "*any* defendant who testifies at *any* proceeding, whether under a grant of immunity or otherwise." 246 F.Supp.2d at 1086 n.21 (emphasis added).

If a non-cooperating defendant gave testimony contrary to his joint-defense statements, could a cooperator reveal this to the prosecutor, and could the prosecutor then use those statements to cross-examine the defendant? If a non-cooperating defendant testified and sought to shift blame onto his or her co-defendant in a manner contrary to his joint-defense statements, would these courts uphold the co-defendant's use of those statements in cross-examination? After *Stepney* and *Almeida*, the answers to these questions are far from clear, no matter what the joint-defense agreement may provide.

—❖—

**Jacqueline C. Wolff** and **Alan Vinegrad** are members of the White Collar Defense Practice at Covington & Burling, New York.

The publisher of this newsletter is not engaged in rendering legal, accounting, financial, investment advisory or other professional services, and this publication is not meant to constitute legal, accounting, financial, investment advisory or other professional advice. If legal, financial, investment advisory or other professional assistance is required, the services of a competent professional person should be sought.